IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>HISTORICAL INFORMATION<br>ASSOCIATED WITH SNAPCHAT<br>USERNAME "manolo_otg" THAT IS<br>STORED AT PREMISES CONTROLLED<br>BY SNAP, INC. | Case No. 2:19-mj-307-JHR |

## AFFIDAVIT OF DANIEL TOWNSEND

I, Daniel Townsend, having been duly sworn, state as follows:

1. I am a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI") in Portland, Maine, and have been so employed since October 2016. I am currently assigned to the Safe Streets Task Force in Portland. I have also served as a TFO with the Department of Homeland Security, Homeland Security Investigations, in South Portland, Maine since September 2014, working on sex trafficking investigations. I have been employed by the Portland Police Department since 2006 and currently hold the rank of Detective. I graduated from the Maine Criminal Justice Academy's 12th Basic Law Enforcement Training Program in May 2007. I have written and have been involved with the execution of numerous search warrants.

2. I make this affidavit in support of an application for a search warrant for the following:

   a. Information associated with the Snapchat profile with usernames: "manolo_otg" that is stored at premises owned, maintained, controlled, or operated by Snap, Inc., a company that is located at 63 Market Street, Venice, California, 90291.

1

The information to be searched is described in the following paragraphs and in Attachment A to the search warrant application. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Snap Inc. to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID described above.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Rayevon Deschambault has committed violations of Title 18, United States Code § 2251, sexual exploitation of children and Title 18, United States Code § 1512, tampering with a witness, victim, or an informant, and that there is probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5. Pursuant to a search warrant signed by United States Magistrate Judge John H. Rich III on September 24, 2019, on October 4, I seized two videos from a cellular telephone extraction. The videos were extracted from a cellular telephone which had been seized from Rayevon Deschambault at the time of his arrest on State of Maine drug charges on August 20, 2019.

6. The first video, which was timestamped by the cellular telephone as having been created on August 13, 2019, depicts Rayevon Deschambault engaging in oral-genital contact with a person known to me, whom I will refer to as "Victim." The second video, which was timestamped by the cellular telephone as having been created on August 14, 2019, depicts

2

Rayevon Deschambault engaging in genital-genital contact with Victim. Both videos clearly show Victim's face.

7. Victim is a person known to me and I recognize her in the video. I have obtained a certified birth record from the State of Maine Bureau of Vital Records documenting that Victim was born in December 2004.

8. I identified Rayevon Deschambault as engaging in the sexually explicit conduct described in paragraph 6 because of his distinctive arm- and hand tattoos that are visible in the videos during the contact. I have compared the tattoos I observed in the videos with photographs taken by the Cumberland County Sheriff's Office in Portland, Maine during Deschambault's arrest processing and concluded that the tattoos visible in the photographs are the same ones visible in the videos. Additionally, Maine Drug Enforcement Agency Special Agent Austin Clark has reviewed the videos. Special Agent Clark confirmed to me that the location shown in one of the videos was the same room that Clark and other officers searched pursuant to a separate search warrant for Deschambault's bedroom located in his mother's house at 140 North Street, 1st floor in Westbrook Maine on August 20, 2019. According to arrest records I have reviewed, Deschambault is now 25 years old but was 24 at the time of the videos on August 13 and 14, 2019.

9. I have listened to multiple jail calls in which Deschambault is a participant while incarcerated in Cumberland County Jail. I have included transcriptions of relevant portions of two of these phone calls. Both calls are between Rayevon Deschambault and an unknown male using the telephone number (207) 215-7666. In each one, "RD" stands for Rayevon Deschambault, "UM" stands for "unknown male" and "IA" stands for "inaudible." I have replaced Victim's name, and the spelling of her name with asterisks.

10. The first call was placed on September 22, 2019 at approximately 7:15 pm, and relevant portions of the transcript follow:

**UM: You figure anything else more bout your case?**

**RD: Yea, yea man, they fuckin got me on some crazy shit apparently**

**UM: Oh, for real?**

**RD: Yea, that's why I wrote you in my letter, I guess they're trying to charge me um, exploitation of a minor**

**UM: Oh fuck**

**RD: Yea**

**UM: Yea, I'm like, No [IA]**

**RD: Same shit that um, Chris McMahon**

**UM: Oh, for real? Yea, He's chillen in A1**

**RD: Crazy how we were just talkin shit about the kid, and jokin how he's a fuckin clown for that and now they're trying to charge me for the same thing**

**UM: Right, yea, no dude it's mad easy for that shit, I don't even hit on people for that type of shit like young young young ass girls that I care about [IA], like it's so easy to get caught up on that shit**

**RD: Yea, fucked up bro**

**UM: Fuckin THOTs**

**RD: Yea the one that Maizie was commenting about [IA]**

**UM: Oh, yo, yo yo**

**RD: [IA], That shit is true**

...

**RD: Yea, can you go on snap real quick?**

**UM: Yea, hold on yo, um**

**RD: (Talking to subjects in background) Give me like five seconds, it's gonna be quick, I gotta message someone real quick for me**

**UM:** Alright I'm logging on right now, fuckin, Oh, alright what's good?

**RD:** Alright, go through my um, go in my inbox right

**UM:** Yea

**RD:** um, is there a person named ****** in there?

**UM:** Who?

**RD:** ******

**UM:** ******?

**RD:** Yea

**UM:** Uhhh, not right off, but I'm scrollin down, it sounds familiar

**RD:** It's *-*-*-*-*-*, and search for them in my

**UM:** Yea, I got you, got her right here

**RD:** Slide over

**UM:** What do you mean slide over?

**RD:** Yea, check the history of the messages

**UM:** Hold, I fucked up [IA] ******, fuckin trying to find it again, 4 weeks ago, 4 weeks ago

Overlapping voices

**RD:** Slide over so you can send her a chat, and then send her a chat for me

**UM:** Alright, yea um hold on, I'm trying to find her right now, fuckin I lost it, fuckin A, Ok, there we go, alright what's good?

**RD:** Message her, and be like, "Yo, I'm not mad at you, but Why did you lie to me bout your age?" And then save it in chats, and then screenshot all of those messages between me and her

**UM:** Should I do it after she responds?

**RD:** Um

**UM:** Like, [IA], just [IA] just so she don't get like scared and shit?

**RD:** Yea, yea, yea, and if she sends you, if she sends me a regular chat, like a regular screen snap of her responding, you gotta screenshot it, I need proof of that bro, for court if

5

they do end up trying to bring up charges on me, cause they're trying to say that they found a video of me doing shit with her on my phone allegedly, they're saying she's under the age of 18

**UM:** These bitches these days look grown as fuck

**RD:** Yea bro

**UM:** Crazy

**RD:** I'm gonna push something to the governor that she needs to pass a law and revise a law that says if females lie in order to pursue a sexual relationship with a male of the age [IA] that they should be charged too, I'm gonna really push that shit

**UM:** Right exactly

**RD:** They gonna call that [IA]

**UM:** THOT's, yea I sent that out 42 seconds ago so I'm waiting on that

**RD:** Alright, make sure that, oh damn, fuck, I want, see if she has anything lying about her age throughout the history of our messaging, and if you see anything screenshot it, you should just screenshot all the messages, really, so since she's hittin me up and shit

**UM:** Uh, well, yea, I'll wait til, like she responds, I don't want to scare her off and shit

**RD:** Yea, I don't want her to block me or nothin first though

**UM:** [IA]

**RD:** You know what I mean?

**UM:** Nah, I just looked, there's nothing

**RD:** Alright

**UM:** So, hopefully, I get that message

   11.   The second call was placed on September 24, 2019 at approximately 2:25 pm and relevant portions of the transcript follow:

**RD:** Did you ever go onto Snaps and see if that person responded?

**UM:** Uhhh, I'm nervous, I'm nervous for ya, Do you want me to open it right now?

**RD:** Oh, yea, did they message back?

**UM:** Yea

6

**RD: Yea, what they say? And then obviously save it and screenshot it**

**UM: Three question marks**

**RD: Is that what they said?**

**UM: No, that's what ****** said**

**RD: Be like, yo, just be like what do you mean question marks, you lyin to me about your age. Why would you do that? That shit can get me in trouble.**

**UM: That shit got me in trouble, or, or is it gonna get me in trouble?**

**RD: The shit is gonna get me in trouble**

**Did you screenshot? You already screenshot the other shit? That might have been why she questioned marked it**

**UM: Nah, there was really nothing to screenshot before that**

**RD: Yea, yea, yea, so don't screenshot nothin til she admits to it. Anyone else message me?**

12. I observed a forensic interview of Victim conducted on September 27, 2019. A forensic interview is one that is routinely conducted by a trained specialist when there is information that a minor has been sexually abused. It is designed to limit the trauma that can be inflicted on a victim from multiple retellings of events. During that interview, Victim told the interviewer that she had received one message via Snapchat from Deschambault, whom she only knows as "Manolo" while Deschambault was in jail on drug charges. She further said that she did not respond.

13. I know that "manolo_otg" is Deschambault's Snapchat ID because during the forensic interview, Victim was presented with a printout from Facebook showing Rayevon Deschambault's profile picture and display name, "Manolo Caine." A further perusal of Deschambault's open and publically accessible Facebook and Instagram posts revealed a post from Deschambault's Instagram account, also using the display name "Manolo Caine" from July 19, 2019, which said "Add my snap I be Wildn @manolo_otg." I understand from my training

7

and experience that Snapchat is frequently referred to simply as "Snap" and that the "@" symbol is frequently used to indicate a user name. I have compared the publically posted material on the "Manolo Caine" Facebook account and the "Manolo Caine" Instagram account and have concluded that they are both used by Rayevon Deschambault. They both contain "selfies" and images of Rayevon Deschambault.

14. Also during the forensic interview, Victim stated that she had been corresponding with "Manolo" via Snapchat since approximately the beginning of the Summer, 2019.

## INFORMATION ABOUT SNAPCHAT

15. Based upon information from other law enforcement officers and publicly available information, I know the following about Snapchat:

a. Snap, Inc., is headquartered in Venice, California, and owns and operates a free access social networking website of the same name that can be accessed at http://www.snapchat.com. Snapchat is one of the most popular applications for sending and receiving 'self-destructing' messages, pictures, and videos. Referred to as 'snaps', the company processes approximately 700 million of them every day on Apple's iOS and Google's Android operating systems. Snapchat users access the application frequently. According to marketing material provided by the company, the average Snapchat user checks their account 14 times a day.

b. A "snap" is a picture or video message taken and shared with other Snapchat users in real-time. The sender of a snap has the option of setting a timer for how long a snap can be viewed. Once a snap has been viewed it is deleted from the company's system and is no longer visible to the recipient. Snapchat users can send text messages to others using the Chat

8

feature. Once a user leaves the Chat screen, messages viewed by both the sender and the receiver will no longer be visible. In addition, Snapchat users can send pictures to other users by utilizing the camera on their device. Pictures can also be sent from the saved pictures in the photo gallery of the device. Accessing a Snapchat account and "snaps" constitutes "electronic communications" within the meaning of 18 U.S.C. § 3123. See 18 U.S.C. §§ 3127(1) and 2510(12).

        c.        "Our Stories" is a collection of user submitted "Snaps" from different locations and events. A Snapchat user, with the location services of their device turned on, can contribute to a collection of snaps regarding the event. For example, multiple different Snapchat users at a rave could all contribute to the same "Our Stories" collection by sharing their snaps, even if they do not know each other. Users can also view "Our Stories" events if they are not actually present at the event by subscribing to the story. In addition to "Our Stories", a Snapchat user can keep a sort of photo/video diary using the "Story" feature. Each snap in a "Story" documents the user's experience. Based on the user's privacy settings, the photos and videos added to a "Story" can be viewed either by everyone on Snapchat or just the user's friends. Stories are visible to other users for up to 24 hours.

        d.        In addition to photos, videos, "Snaps" and stories, "Snapcash" is an online money transfer service offered by Snapchat. The actual business platform is run by "SquareUp", the distributor of a mobile credit card reader and application Square Register. Snapcash can be used to transfer money between Snapchat users using a linked, U.S. issued Visa or MasterCard debit card only; using credit cards is not permitted. Snapcash can only be sent to other users who have a linked debit card. Snapcash has a $250 weekly limit but can be upgraded to a $2,500 weekly

limit. Users who upgrade have to provide their full name, date of birth, and Social Security number.

   e. While a Snapchat message may disappear, the record of who sent it and when still exists. Snapchat records and retains information that is roughly analogous to the call detail records maintained by telecommunications companies. This includes the date, time, sender, and recipient of a snap. Additionally, Snapchat stores the number of messages exchanged, which users they communicate with the most, message status including if and when the message was opened, and whether the receiver used the native screen capture function of their device to take a picture of the snap before it disappeared.

   f. Snapchat asks users to provide basic contact and personal identifying information to include date of birth. When a user creates an account they make a unique Snapchat username. This is the name visible to other Snapchat users. An email address is required to register a Snapchat account and a new user must also provide a mobile phone number. This phone number is verified during the registration process. Snapchat sends an activation code which must be entered before proceeding with the registration step. However, a user may elect to bypass entering a phone number so one may not always be present in the user's account. Snapchat also retains the account creation date.

   g. Snapchat stores device information such as the model, operating system, operating system version, mobile device phone number, and mobile network information of devices used in conjunction with the service. They also collect unique device identifiers such as the Media Access Control (MAC) address and the International Mobile Equipment Identifier (IMEI) or Mobile Equipment Identifier (MEID) of devices used to access Snapchat. In the event

10

the Snapchat user's application crashes, the company also collects a list of other installed applications on the device to detect any potential software conflicts.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

16. I anticipate executing these warrants under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrants to require Snap, Inc., to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B of the search warrant application. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B of each search warrant application.

## CONCLUSION

17. Based on the forgoing, I request that the Court issue the proposed search warrant.

18. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

19. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

20. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until the warrants are returned to the Court subject to any future motions to continue sealing. These documents discuss an ongoing criminal

investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

*[signature]*

Daniel Townsend
Task Force Officer
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence on this 7th day of October, 2019.

*[signature]*

Nancy Torresen
United States District Judge